COURT OF APPEALS OF VIRGINIA


Present:  Judges Baker, Elder and Fitzpatrick


MARK U. PRICE

v.   Record No. 0035-95-4                    MEMORANDUM OPINION*
                                                PER CURIAM
ARLINGTON DEPARTMENT OF HUMAN SERVICES       DECEMBER 19, 1995

AND

LINDA L. DONLEY

v.   Record No. 0065-95-4

ARLINGTON DEPARTMENT OF HUMAN SERVICES


              FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                    Benjamin N. A. Kendrick, Judge

              (Mark Urry Price, pro se, on briefs).

              (Linda L. Donley, pro se, on briefs).

              (Mary E. Craig, Assistant County Attorney,
              on brief), for appellee.


     Mark U. Price and Linda L. Donley appeal the decision of the

circuit court terminating their parental rights to their two

daughters, Lynda Elizabeth ("Ellie") and Sara Vanessa.  Upon

reviewing the record and briefs of the parties, we conclude that

these appeals are without merit.  Accordingly, we summarily

affirm the decision of the trial court.  Rule 5A:27.

     "When addressing matters concerning a child, including the

termination of a parent's residual parental rights, the paramount

---

     *Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

consideration of a trial court is the child's best interests."
Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123,
128, 409 S.E.2d 460, 463 (1991). The trial courts "'are vested
with broad discretion in making the decisions necessary to guard
and to foster a child's best interests.'" Id. (citation
omitted). On appeal, when the trial court has heard the evidence
ore tenus, its judgment will not be disturbed unless plainly
wrong or without evidence to support it. Id.

Under Code § 16.1-283(B), the Department of Human Services
(DHS) must establish by clear and convincing evidence that (1)
the neglect and abuse suffered by Ellie and Sara "presented a
serious and substantial threat to [their] life, health or
development;" and (2) that it is not "reasonably likely" that the
conditions which caused the neglect and abuse can be
"substantially corrected or eliminated" to allow the children to
return to either parent in a "reasonable period of time." Code
§ 16.1-283(B)(1) and (2). Proof that the parents suffer from a
severe mental or emotional illness which creates "no reasonable
expectation" that the parent will be able to "undertake
responsibility for the care needed by the child" is prima facie
evidence that the abusive or neglectful conditions have not been
corrected. Code § 16.1-283(B)(2)(a). Similarly, proof that the
parents have not responded to or followed through on appropriate
rehabilitative efforts and services offered through DHS or other
agencies is prima facie evidence that the abusive or neglectful

2

conditions have not been corrected. Code § 16.1-283(B)(2)(c).

Donley and Price voluntarily entrusted Ellie and Sara to DHS in 1989. At that time, Ellie was two years old and Sara was ten months. Both girls were developmentally delayed. When Ellie entered foster care, she was extremely passive with a limited vocabulary and a reluctance to interact. Ellie's play themes revolved around being hurt and needing protection. Ellie would try to hurt herself, saying "Ellie is a monster; Ellie is bad." Ellie also displayed evidence of sexual abuse, including excessive masturbation. After four years of therapy and despite the continuity of a single foster home placement, Ellie's therapist testified Ellie "is a very traumatized child" who has been diagnosed as suffering from post-traumatic stress disorder. It is likely that Ellie will need therapy throughout her life.

Sara also shows signs associated with post-traumatic stress disorder, specifically dissociation. From the time Sara entered foster care, she had problems bonding with caregivers, which her therapist testified related back to problems arising when Sara was very young. Sara's problems were exacerbated by numerous foster care placements. Like Ellie, Sara displayed excessive masturbation.

### Mark U. Price

I. Price argues that the trial court lacked jurisdiction because no foster care plan seeking adoption rather than return to parents was filed prior to the filing of the petition to

terminate Price's parental rights. Code § 16.1-283(A). The record demonstrates that the necessary foster care plan was filed on February 5, 1993 and the petition was filed on February 8, 1993. Therefore, Price's argument is without merit.

II. Price also argues that there was insufficient evidence showing that he was not reasonably likely to substantially correct the conditions which led to his daughters' foster care placement. Price disputes at length and in detail the sufficiency of the testimony presented by the DHS witnesses. However, the trial judge who heard the evidence was entitled to determine the credibility of the witnesses. Bridgeman v. Commonwealth, 3 Va. App. 523, 528, 351 S.E.2d 598, 601 (1986). Competent and credible evidence indicated that Price had been a physically and emotionally abusive husband and father and that he refused to accept responsibility for any wrongdoing on his part.

Dr. Sahni had counseled Price extensively between 1990 through early 1993 and testified that Price was not capable of parenting the girls. Dr. Sahni had worked with Price and Sara and knew Sara had special needs which Price was not able to address. Dr. Sahni also spoke directly with Ellie's therapist. Dr. Sahni admitted that Price expressed hostility towards Ellie in connection with a specific allegation of sexual abuse, which Price initially denied, then explained away as merely misconstrued. Price also claimed that he was the victim of the physical violence between him and his wife.

4

Donald Soeken testified on Price's behalf.  Soeken testified that he had had about thirty face-to-face counseling sessions with Price in 1987, a few in 1988, and none since that time.  Any information Soeken had concerning Price after that time came through telephone conversations.  Soeken supported Price's characterizations of himself as a victim who was "blackballed," "framed," and the victim of bad legal and medical advice.  However, Soeken's credibility was undercut by his demonstrated lack of knowledge of a number of Price's criminal convictions.

Donley testified concerning the abusive conditions of marriage, as well as her belief that Price had, in fact, sexually abused his daughter.  Ellie's foster mother described numerous specific incidents of highly sexualized behavior by Ellie, including some attributed by Ellie to "Daddy Mark."  Dr. Sahni indicated Price was suspicious of others, tended to blame others, and had trouble accepting criticism.  Price's own testimony, when juxtaposed against the testimony of Dr. Sahni, the foster parents, Price's ex-wife, and the workers with DHS, demonstrated Price's inability to accept responsibility for his own actions.  Therefore, there was substantial, credible testimony presented to the trial court to demonstrate by clear and convincing evidence the abusive or neglectful conditions which caused the girls to be placed in foster care had not been substantially corrected or eliminated to allow the girls' safe return to Price.

III.  Finally, Price argues that the DHS failed to "exercise

5

reasonable efforts to remedy the conditions" leading to his children's foster care placement.  Through DHS and other agencies, Price and Donley were provided with marital and individual counseling, parenting classes, housing assistance, transportation, and job placement referrals.  While Price was prohibited from visiting with Ellie following the allegations of sexual abuse and Price's resulting hostility towards Ellie, DHS facilitated regular visits with Sara.  DHS worked to return the girls home for several years before changing the goal to adoption.

There was sufficient credible evidence for the trial court to find that DHS had provided reasonable and appropriate services designed to eliminate the conditions which led to the foster care placement.

### Linda L. Donley

I.  Donley argues that there was no evidence that she neglected or abused her children after her divorce from Price.[1] However, DHS was not required to demonstrate incidents of abuse by Donley while the children were in foster care.  Instead, DHS was required to show that the abusive or neglectful conditions which led to the children's initial foster care placement had not been and could not be substantially corrected or eliminated within a reasonable period of time.

---

[1]Donley also refutes an incident allegedly described by Sara's therapist in testimony before the district court.  No such incident was described in trial before the circuit court and thus it is not part of the record before us.

Several witnesses testified that Donley's ability to parent did not improve despite her divorce from Price in 1992. Donley faced issues of depression and post-traumatic stress disorder. She was unable to set appropriate limits on the girls' behavior during visitations. During the time when DHS was working towards returning the girls to Donley, Ellie's foster mother noted that Donley returned Ellie several hours earlier than required or indicated she did not want the girls because she was not feeling well.

DHS presented prima facie evidence demonstrating that the abusive or neglectful conditions could not be substantially corrected so as to allow the children's safe return within a reasonable period of time.

II. Donley contends that her therapist, Dr. Firth, was not competent to testify about Donley's ability to parent her two daughters because Dr. Firth had never seen the children or seen Donley interact with them. Dr. Firth had seen Donley in therapy for several years. Based upon her knowledge of Donley, Dr. Firth admitted that Donley did not qualify as an exceptional parent "[n]ot for lack of trying, but for the issues that she was still struggling with within herself to resolve in therapy."

The evidence was overwhelming that the girls had extensive needs requiring exceptional parenting skills. Even if Dr. Firth was not qualified to opine about Donley's ability to parent these children based upon actual observation, Dr. Firth was qualified

7

to testify about Donley's abilities to parent children with exceptional needs. Furthermore, Donley raised no objections to Dr. Firth's competency to render an opinion on Donley's ability to parent her daughters. Therefore, Donley has not demonstrated that the trial court committed reversible error in admitting Dr. Firth's opinion testimony.

III. Donley admitted that her daughters have special needs and testified that she was prepared to parent the girls. She had gotten out of an abusive marriage and had worked through the related battered woman syndrome issues. Donley admitted that she is hampered physically because of her weight, but testified that she was exercising regularly. However, Dr. Firth testified that, while Donley had made progress, Donley still faced substantial issues which would require several more years of therapy. Donley admitted that she was not completely recovered.

The evidence demonstrates that Donley had taken steps to improve the conditions which led to her children's foster care placement. Nevertheless, we cannot say the trial court erred in finding that the best interests of the girls required the termination of Donley's parental rights. Donley's most recent attempt to parent the girls was marred by Donley's anger and frustration. Even if Donley's version of the "tying" incident was accepted, Donley admitted she angrily threatened to tie Sara to a bed when Sara would not sleep. Donley also returned the girls earlier than necessary, or waived chances to be with the

8

girls. DHS's attempts to return the girls to Donley fell apart through Donley's inability to deal effectively with normal parenting responsibilities.

Moreover, it is not in the girls' best interests to remain in foster care until Donley is finally able to provide the necessary parenting. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming [her] responsibilities." Kaywood v. Dep't of Social Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

Already, the girls have been in foster care for nearly six years. Ellie's therapist testified that Ellie has bonded with her foster parents, that she loves them and indicates she is happy with them. Ellie needs the "stability and consistency" which she has with her foster parents, who have demonstrated their ability to work with the therapist consistently.

Specifically, the therapist offered the following opinion:
> If Ellie were to be taken from their home now, it's my opinion that she would be at risk to hurt others, hurt herself in very aggressive behaviors, and/or to withdraw from the world and become lost in a fantasy world, to lose her trust in the world and the safety and security of it.

The therapist also noted that Ellie's play moved past the need for security at the same time Ellie's visits with Donley stopped.

In her current foster home placement, Sara has established a close bond with her foster mother. Sara shows signs of both

9

psychological and physiological improvement and maturity. Sara's therapist testified that if the bond with Sara's current foster parents was broken,

> I don't know how this child would ever comprehend that it really had nothing to do with her, and that people were really looking after her needs. Because it certainly would make her very, very despairing and despondent internally, and I don't know how that would affect her development.

The therapist noted that Sara "needs to be where adults could put her needs first, where they can cater to that and then offer appropriate limits and boundaries to help her continue to grow."

DHS presented clear and convincing evidence to demonstrate that it was in the best interests of these children to terminate the parental rights of Price and Donley. The trial court's decision was not plainly wrong or without evidence to support it. Accordingly, that decision is summarily affirmed.

<u>Affirmed.</u>